**In re Grover Donald LANHAM, Debtor.**

**No. 05–10498 EEB.**

United States Bankruptcy Court, D. Colorado.

March 24, 2006.

Gregory S. Bell, Fort Collins, CO, for Debtor.

## ORDER OF DISMISSAL

ELIZABETH E. BROWN, Bankruptcy Judge.

THIS MATTER comes before the Court on the Motion to Dismiss Case ("Motion"), filed by the Internal Revenue Service ("IRS") and the Chapter 13 Trustee ("Trustee"). Following an evidentiary hearing, the Court FINDS and CONCLUDES as follows:

### A. Background

This is not the Debtor's first bankruptcy case. In March, 2001, he filed a Chapter 7 case. At the time, the IRS was pursuing its claim against him for over $500,000 in income taxes which the Debtor failed to pay during the years 1992 through 1995. The Debtor testified at the hearing that he did not pay taxes during those years because he relied on bad advice from an unnamed organization which had assured him he could be "out of the tax system." The IRS contested the dischargeability of the Debtor's 1992–1995 income taxes in an adversary proceeding. The IRS claimed the taxes were non-dischargeable under 11 U.S.C. § 523(a)(1)(C) because the Debtor had made fraudulent returns or had willfully attempted to evade or defeat his taxes. Immediately prior to the scheduled trial in December, 2003, the Debtor and the IRS reached a settlement. The settlement provided that 65% of the unpaid federal income tax assessments against the Debtor for the years 1992–1995, plus inter-

est allocable to those taxes was non-dischargeable, pursuant to 11 U.S.C. § 523(a)(1)(C). The balance of the taxes, penalties, and interest were discharged. The parties agreed that the amount of the nondischargeable taxes would be $263,450.70. This liability is referred to herein as the "Non–Dischargeable Taxes." The Court approved the stipulation and entered judgment in accordance with its terms.

According to the Debtor's testimony, he never intended to pay all of the Non–Dischargeable Taxes. He says that his understanding was that the settlement was structured in order to allow him to pursue an offer in compromise with the IRS and, if he could not reach an acceptable compromise, to file a Chapter 13. The Debtor says that the amount of the Non–Dischargeable Taxes was specifically negotiated to be lower than the unsecured debt limit for eligibility for Chapter 13 in order to preserve the Chapter 13 option. The record does not reflect whether the IRS was aware of the Debtor's understanding regarding the settlement agreement or whether the Debtor ever proposed an offer in compromise to the IRS after the conclusion of the adversary proceeding. However, on January 11, 2005, little more than a year after the settlement of the adversary proceeding in his prior case, he filed this Chapter 13 case.

The Non–Dischargeable Taxes are the only unsecured debts scheduled in this case.[1] The only other creditors listed are three secured creditors, holding liens against his vehicles. The Debtor's initial Chapter 13 plan proposed payments of $479 per month for 36 months. The secured debts were to be paid outside the plan. After deductions for attorneys' fees and the fees of the Chapter 13 Trustee, the IRS would have received $14,676 or 6.6% of the $222,953.81 in Non–Dischargeable Taxes. The Debtor's first Amended Plan extended the monthly $479 payments for 42 months, resulting in a $17,289.09 payment to the IRS or 7.8% of the Non–Dischargeable Taxes. After the Chapter 13 Trustee's office objected to the Debtor's contribution to a retirement plan, the Debtor eliminated that expense from his budget and filed a Second Amended Plan, which increased the monthly payments by $614 to $1,093 per month for the remainder of the 42–month payment period. Under the Second Amended Plan, the IRS would have received $47,383.64, or 21.3% of the Non–Dischargeable Taxes. Finally, the Debtor filed a Third Amended Plan to address the IRS' contention that its claim was partially secured by the Debtor's retirement account. This Plan increased the length of the $1,093 payments to 54 months for a total plan length of 60 months. Under the Third Amended Plan, the IRS would receive $30,918.28 on its secured claim and $19,350.81 on its unsecured claim, for a total of $56,269.09 or 25.2% of the Non–Dischargeable Taxes.

The IRS and the Chapter 13 Trustee have objected to each Motion to Confirm which the Debtor has filed. The Court has held the matter of confirmation of the

---

**1.** The Debtor scheduled this debt at $257,175.00. The IRS, in its Amended Proof of Claim, filed on August 30, 2005, contends that $222,953.81 was due on the Non–Dischargeable Taxes as of the date of the filing of the Chapter 13 case. It is unclear how the liability to the IRS was reduced from the $263,450.70 judgment amount to $223,953.81 on the date of the Chapter 13 petition. The IRS did receive distributions from the Debtor's Chapter 7 case in the amount of $21,814.65. There was no evidence that any other payments were made. In fact, the IRS representative who testified at the hearing stated that the Debtor did not make any voluntary payments on the Non–Dischargeable Taxes after the stipulation was approved.

Third Amended Plan in abeyance pending the resolution of the Motion to Dismiss.

## B. The Motion to Dismiss

The IRS filed its Motion to Dismiss this case after the filing of the Debtor's Second Amended Plan and prior to the filing of the Third Amended Plan. It alleges that the case should be dismissed under 11 U.S.C. § 1307(c), for cause, because the Debtor filed this Chapter 13 case in bad faith. According to the IRS, the Debtor's bad faith is shown by, among other things, his overstatement of expenses, his lavish lifestyle, and his intent to discharge the tax debt which he previously agreed was non-dischargeable in his Chapter 7 case. The Chapter 13 Trustee joined in the IRS' motion. At the hearing, the Trustee stressed the delay of nearly ten months from the date of filing without confirmation of a plan, as well as the Debtor's "deceptive motives" in filing.

The Debtor argues that he has not filed this case in bad faith, but rather in an honest attempt to recover from the bad tax advice he received in the 1990's. The Debtor points out that he has continually increased the total amount of payments with each amended plan, and he contends that the delay in this case has been occasioned by his attempts to comply with all of the requirements of the Chapter 13 Trustee's office.

## C. Applicable Law

■ Section 1307(c) provides a non-exclusive list of grounds upon which a bankruptcy court may dismiss a Chapter 13 case for "cause". Bad faith is not specifically listed, but nonetheless may constitute "cause" for dismissal. *In re Gier*, 986 F.2d 1326 (10th Cir.1993); *In re Merrill*, 192 B.R. 245 (Bankr.Colo.1995). Lack of good faith is shown when a debtor files a petition without intending to perform the statutory obligations of a debtor under the Bankruptcy Code or when a debtor's conduct before or during a case constitutes an abuse of the provisions, purpose or spirit of the chapter under which relief is sought. *In re Merrill, supra.* In determining whether a case has been filed in bad faith, the Tenth Circuit has adopted a "totality of the circumstances" test. *In re Young*, 237 F.3d 1168 (2001); *Pioneer Bank v. Rasmussen*, 888 F.2d 703 (10th Cir.1989), *Flygare v. Boulden*, 709 F.2d 1344 (10th Cir.1983). In the *Flygare* case, the Tenth Circuit adopted the Eighth Circuit's non-exclusive list of eleven factors to consider in making this determination. In *Pioneer Bank v. Rasmussen*, it added three additional factors to the list.

■ Accordingly, this Court considers the following factors in determining whether a case has been filed in bad faith:

1) The amount of proposed payments and the amount of the debtor's surplus;

2) The debtor's employment history, ability to earn and the likelihood of future increases in income;

3) The probable or expected duration of the plan;

4) The accuracy of plan's statements of the debtor's debts, expenses, and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court;

5) The extent of preferential treatment between classes of creditors;

6) The extent to which secured claims are modified;

7) The type of debt sought to be discharged and whether any such debt is non-dischargeable in Chapter 7;

8) The existence of special circumstances such as inordinate medical expenses;

9) The frequency with which the debtor has sought relief under the Bankruptcy Reform Act;

10) The motivation and sincerity of the debtor in seeking Chapter 13 relief;

11) The burden which the plan's administration would place upon the trustee;

12) Whether the debtor has stated his debts and expenses accurately;

13) Whether the debtor has made any fraudulent misrepresentation to mislead the bankruptcy court; and

14) Whether the debtor has unfairly manipulated the Bankruptcy Code.

## D. Discussion

■ In its discussion below, the Court will mention only those of the fourteen factors that are implicated by the facts of this case. The factors not mentioned are either not a basis for a bad faith finding in this case or they are neutral in this case.

### The amount of the proposed payments and the amount of the Debtor's surplus.

The current Third Amended Plan proposes payments of $479 per month for six months and $1,093 for 54 months. A payment amount of $1,093 per month is not an insignificant payment. However, it is questionable whether $1,093 accurately represents the Debtor's monthly surplus. The actual surplus may, in fact, be much higher. The accuracy of the Debtor's statement of his monthly income and expenses is highly questionable and is discussed in greater detail below.

### The accuracy of the plan's statements of the Debtor's expenses and whether any inaccuracies are an attempt to mislead the court.

### Whether the Debtor has made any fraudulent misrepresentations to mislead the Bankruptcy Court.

These two factors, probably more any others, are indicative of the Debtor's lack of good faith. There are numerous problems with the Debtor's statement of his monthly expenses as reflected in his Schedule J, as originally filed, and as amended on July 21, 2005.

The Debtor significantly overstated the tuition expense for his son who attends Colorado State University. On Schedule J as originally filed, this expense is shown as $1,585.99. On the Debtor's Amended Schedule J, it is shown as $1,285.99 per month which would equate to $15,431.00 per year. However, at the hearing, the Debtor admitted that he pays only $2200 per semester for two semesters, or $4400 per year, for tuition at CSU. Even assuming there is additional expense for books and the like, the college expense has been overstated by almost $10,000 per year.

Furthermore, the Debtor's Schedule I shows he pays $1,400 per month for insurance premiums, which the Court finds highly questionable. It also shows $1,870 per month in housing expense, even though the Debtor does not own any real property. The Debtor's expenses for food ($750/month) and entertainment ($200/month) are too high for one person.

Schedule J shows an expense for $300.00 per month for an "office assistant." While the amount of this expense may be reasonable for a self-employed individual, frankly the Court has serious doubt as to whether the Debtor actually pays an office assistant each month. The transcript reflects the following responses from the Debtor under questioning by counsel for the Chapter 13 Trustee:

Q. And, who is your office assistant?

A. In the past, I hired a lady to help me do my business. She also helps me with outbound calls, thank you notes, etcetera, that I need to keep

up with in terms of contact with my clients.

THE COURT: I believe the question was who?

THE WITNESS: Oh, I'm sorry. Say again, ma'am?

Q. Who is the person that you hired.

A. In the past, it's been a lady named Alhberg. I am sorry that I can't recall the name.

Although the Debtor later gave a name for this alleged employee, the Debtor's testimony lacked credibility.

The Court also questions the Debtor's credibility regarding his income and expenses because of the testimony at hearing regarding whether the Debtor should be classified as a "statutory employee" or a "common law" employee for tax purposes. A "statutory employee" may take unlimited business deductions, but a "common law" employee must limit his business deductions to 2% of adjusted gross income. The Debtor's employer, Allstate Insurance, has never considered the Debtor to be a statutory employee. It has issued W–2's to the Debtor for each year's income. However, the Debtor disputes this classification. In 2003, he altered the W–2 issued by his employer by checking the statutory employee box. The Debtor's employer furnishes him with a laptop, a cell phone, a copy/fax machine, and a budget for business expenses. The employer reimburses the Debtor for his business expenses for air fare, mileage, automobile rental, meals, entertainment, and hotels.

Despite being reimbursed by his employer for the expenses listed above, the Debtor has deducted over $171,000 in business expenses on his tax returns for the years 2002–2004. The business expenses the Debtor has deducted include depreciation on his vehicles, which would not normally be done where mileage is reimbursed by an employer. The total amount of business expenses greatly exceeds the 2% limit, and the Debtor provided no explanation whatsoever of why his business expenses exceeded his reimbursements by such a large amount. Though the Court is not ruling on the propriety of the Debtor's business expense deductions as matter of tax law, the Court does find that the Debtor's history of overstating his business expenses in order to minimize his tax liability calls into question the Debtor's credibility and whether he has been forthright with this Court. He claims that he received bad tax advice in the 1990's, leading to his unwise choice to not pay taxes and to submit highly questionable returns during 1992–1995 at least. It does not appear to this Court that the Debtor has mended his ways. It does not appear that he is sincerely motivated to repay his tax debts through this bankruptcy filing.

The Debtor also listed $710 per month in charitable contributions. This amount is the same in both the original Schedule J, filed on January 11, 2005, and the amendment filed in July. The Debtor's discussion of the recipients of his $8,520.00 per year in charitable contributions had a distinct ring of evasiveness. When asked to whom he contributes this sum of money he listed, among others, the Salvation Army, ARC and Goodwill, but under further questioning, the Debtor admitted he gives clothing and household goods to these entities, not cash. The IRS presented evidence showing that in past years the Debtor has contributed $1,300 to $7,170 per year to charities. When asked if he was contributing more this year than in the past, the Debtor said that he thought that he was because of the hurricanes in the Gulf Coast. However, the hurricanes in the Gulf Coast occurred in late August and September, 2005, after the both the original and amended Schedules J were filed.

Some of the Debtor's expenses are not reasonably necessary for the support of the Debtor or his dependents. He has two sons, the youngest of which is in college. Yet he continues to support both sons. It may be laudable to provide children with a college education and to help them establish themselves financially, but not to do so at the expense of your unpaid creditor.

The Debtor also completely failed to list any income which is contributed to the household by his spouse despite the fact that he admitted at the hearing that she is now employed "part-time," and despite the fact that the expenses shown on Schedule J are clearly for the entire household. The Chapter 13 Trustee has been seeking the information on the Debtor's wife's income almost from the very inception of this case. Although the Debtor testified he provided this information to his attorney, he never amended his Schedule I or his Statement of Financial Affairs to reflect any current or past information on the amount of money his wife has earned. The IRS presented testimony at the hearing that showed that the Debtor's wife earned about $40,000 in wage income in 2002, and over $92,000 in income from the sales of stocks and bonds in 2004. The Debtor's testimony that he has no idea how much is wife is making now or how much she received from the sale of stocks and bonds in 2004 is simply not credible, and is a further indicator of the Debtor's lack of forthrightness with this Court and his creditors.

The Court's overall impression is that the Debtor has significantly overstated his expenses and has significantly understated his household income. The Debtor's reluctance to give a straight answer when questioned about his income and expenses leads the Court to believe that the Debtor is attempting to mislead the Court and his creditors.

## Whether the Debtor has stated his debts accurately.

Much of the testimony at the hearing related to claims that the Debtor has not accurately stated his tax liabilities. The IRS contends that the Debtor owes additional priority income taxes for the years 2002–2004 because he improperly claimed statutory employee status. The State of Colorado also maintains that the Debtor is liable for priority income taxes for the years 2002–2004. The Debtor did not file any Colorado income tax returns for the years 2002–2004 because he claims that, starting in 1999, he "decided to make Texas [his] residence." Texas has no state income tax.

Both the IRS and the State of Colorado have filed claims reflecting priority taxes due. The debtor has objected to the claims of both taxing authorities. The objections to these claims have been held in abeyance pending the resolution of this Motion to Dismiss and the Court does not intend, by this ruling, to make any determination of the amount of the claims or the validity of the Debtor's objections. However, the Court has considered the Debtor's testimony about his tax debts insofar as it impacts the good faith issue.

Perhaps the most troubling aspect of the Debtor's testimony concerned where the Debtor lives. The Debtor's employer testified that he is assigned to four states- Colorado, Utah, Montana, and Wyoming. The Debtor is married and has a wife and son who reside in a home in Fort Collins, Colorado which was formerly owned by the Debtor. The Debtor has claimed home mortgage interest, property tax, and home office deductions for this residence as recently as 2004. The Debtor's car, while registered in Texas, was located at the Fort Collins address at the time of the hearing. The addresses listed as "apartments" on the Debtor's tax returns for the

years 2002–2004 are post-office boxes in Texas or Wyoming, another state without a state income tax. There was no indication that the Debtor maintains any other residence other than the one in Fort Collins. Yet, when asked if he didn't live in Colorado during 2002, 2003, and 2004, the Debtor answered, "I was not a resident of Colorado." The IRS' attorney restated the question more directly, asking, "Did you live in Colorado?" The Debtor's response was, "define live." Further narrowing the question, the IRS' attorney asked where the debtor slept and he admitted that, other than traveling on business, he sleeps in the Fort Collins family home.

The Debtor has no apparent connection to the state of Texas, other than the title documents for one of his cars. His territory for work does not include the state of Texas. There was no evidence that the Debtor maintains a house, an apartment, or any other type of residence in Texas. There was no evidence that the Debtor has moved recently or changed the location of his residence, business or assets. The filing of this bankruptcy case and the previous Chapter 7 case in Colorado shows that the Debtor believes that, at least for the greater part of the six months prior to the filing of each case, his domicile, residence, principal place of business or principal assets have been located in Colorado. *See* 28 U.S.C. § 1408(1). Yet, the Debtor maintains that his residence for tax purposes is in Texas.

During the hearing the Debtor was unwilling to answer the simple question regarding where he lives. This reluctance and the evasive nature of his answers paints a clear picture of who the Debtor is

and what he is trying to accomplish with this Chapter 13 case. The Debtor deeply resents the concept of paying income taxes and despite his apparent repudiation of the "bad advice" he got in the 1990's, he continues to push the envelope and to "play the system" in an attempt to minimize his tax payments. The fact that he may have understated his priority tax debts in this case is merely another page from the same book and does show the lack of overall sincerity with which the Debtor has sought relief from this Court.

### The frequency with which the Debtor has sought bankruptcy relief.

### The type of debt sought to be discharged and whether any such debt is non-dischargeable in Chapter 7.

### Whether the Debtor has unfairly manipulated the Bankruptcy Code.

### The motivation and sincerity of the Debtor in seeking Chapter 13 relief.

In the Debtor's previous Chapter 7 case, he agreed that $263,450.70 of his tax debt was non-dischargeable under Section 523(a)(1)(C) as a result of his fraudulent tax returns or his willful attempts to evade or defeat his tax liability. In this Chapter 13 case, however, such a debt is dischargeable under the more lenient discharge provisions of Section 1328(a).[2] It is beyond any question that the only reason the Debtor filed this Chapter 13 case was to discharge the tax debt which he had already agreed was non-dischargeable. The only other debts scheduled by the Debtor in this case were the three secured debts

---

**2.** This case was filed prior to the effective date of the most recent amendments to the Bankruptcy Code. Under the amended Section 1328(a), the Debtor's Section 523(a)(1)(C) tax liability would no longer be dischargeable even under the broader Chapter 13 discharge.

on vehicles which the Debtor proposed to pay in full outside of his Chapter 13 plan.

■ The fact that a debtor seeks to take advantage of the broader discharge provisions of Chapter 13 is not, in and of itself, a reflection of bad faith. The use of a Chapter 13 proceeding to discharge a debt previously held to be non-dischargeable under Chapter 7 (sometimes referred to as a "Chapter 20") is not *per se* grounds for dismissal under Section 1307(c) for bad faith. *Pioneer Bank v. Rasmussen, supra.*

This case is very similar to the fact situation addressed by the Tenth Circuit in *Pioneer Bank.* In that case, the debtor had unsecured debts which exceeded the debt limit for Chapter 13. He filed a Chapter 7 bankruptcy and Pioneer Bank successfully sued to have the debt he owed to it declared nondischargeable as a result of fraud. Twelve days after the Bankruptcy Court ruled that Pioneer Bank's debt was non-dischargeable, the debtor filed his Chapter 13 case, listing the debt to Pioneer Bank as his only obligation. While observing that the successive filings were not a *per se* indication of bad faith, the Tenth Circuit ruled that the filing of a "Chapter 20" was a significant factor to be considered. In analyzing this issue, the Tenth Circuit cited with approval the following language from the Fourth Circuit's decision in *Neufeld v. Freeman,* 794 F.2d 149 (4th Cir.1986):

> Resort to the more liberal discharge provisions of Chapter 13, though lawful in itself, may well signal an "abuse of the provisions, purpose, or spirit" of the Act, especially where a major portion of the claims sought to be discharged arises out of the pre-petition fraud or other wrongful conduct and the debtor proposes only minimal repayment of these claims under the plan. Similarly, a Chapter 13 plan may be confirmed despite even the most egregious pre-filing conduct where other factors suggest the plan nevertheless represents a good faith effort by the debtor to satisfy his creditors' claims.

794 F.2d at 152–153.

Although the Tenth Circuit had no quarrel with the Bankruptcy Court's finding that the debtor was committing his entire surplus to his plan payments, the $50 per month plan payments resulted in only a 1.5% payment to Pioneer Bank, which, the Tenth Circuit found, was tantamount to a discharge of the debt under Chapter 7. The court concluded that the debtor's filing was not in good faith,

> because the Chapter 13 filing was a manipulation of the bankruptcy system in order to discharge a single debt for de minimus payments under a Chapter 13 plan which was ruled not dischargeable under an immediately previous Chapter 7 filing, when the debtor could not originally meet the jurisdictional requirements of Chapter 13.

888 F.2d at 706.

In this case, the Court finds a similar manipulation of the bankruptcy system. The Debtor was originally ineligible for relief under Chapter 13 because he owed over $500,000 to the IRS alone. However, he negotiated a stipulation which reduced his unsecured debt below the limit for Chapter 13. Then he filed a Chapter 13 case and attempted to discharge his tax debt with a plan that proposed only a 6.6% repayment of the Non–Dischargeable Taxes.

The Chapter 13 Trustee's objections to the various plans filed by the Debtor have caused him to increase the plan payments to the point where the Third Amended Plan now provides for 25.2% payment of

the Non–Dischargeable Taxes.[3] This is certainly not a *de minimus* payment and in that respect this case is different from *Pioneer Bank.* However, in *Pioneer Bank,* the debtor had proposed an honest budget and was committing his entire surplus to his plan. In this case, the Debtor has not been honest about either his expenses or his family income.

The Court finds that the Debtor is not committing his actual surplus to the plan and is not making a good faith effort to satisfy the claim of the IRS. Simply by accurately accounting for the college expenses the Debtor could fund an additional $10,000 per year, or a total of $50,000 into his plan. (This calculation even assumes the Debtor's son would remain in college for the entire five-year duration of the plan.) The Court finds that the Debtor is not sincerely motivated, as he claims. It is clear that the Debtor has no desire to make a bona fide effort to pay the IRS. Rather, he attempts to manipulate the Bankruptcy Code and mislead the Court into "sticking it" to the IRS more time. The Court cannot allow the provisions of the Bankruptcy Court to be used in this manner.

### E. Conclusion

For all of the reasons state above, the Court finds that this case has been filed in bad faith and that cause exists to dismiss this case under 11 U.S.C. 1307(c). Therefore it is,

ORDERED that this case is dismissed. The Clerk of the Court shall notify all creditors of the dismissal.

---

3. The 25.2% figure assumes that there is no priority unsecured debt held by the IRS. However, if the IRS were successful in its challenge to the business expenses claimed by the Debtor in 2002–2004, the IRS would have a priority debt in the amount of $66,851.20, which would leave nothing for the repayment of the Non–Dischargeable Taxes.